IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

KATY PACZKOWSKI, individually and
on behalf of all others similarly situated,

                      Plaintiffs,

  v.

MY CHOICE FAMILY CARE, INC.,

                      Defendant.

OPINION AND ORDER

18-cv-759-slc

---

      Plaintiff Katy Paczkowski brings this action on behalf of herself and all other similarly situated employees, as a collective and class action against her former employer, defendant My Choice Family Care, Inc. ("My Choice"), for violations of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, and Wisconsin wage and hour laws. Paczkowski is a former Care Manager at My Choice, a non-profit managed care organization. In this suit, Paczkowski contends that My Choice violated the FLSA and Wisconsin law by failing to pay overtime compensation to her and other Care Managers.

      Before the court is My Choice's motion to dismiss Paczkowski's state law claim on the ground that My Choice is a nonprofit organization to which Wisconsin's overtime regulation, Wis. Admin. Code § DWD 274.03, does not apply.[1] Dkts. 12, 13. Paczkowski does not dispute My Choice's nonprofit status but disagrees with its contention that nonprofits generally are not covered by Wisconsin's overtime regulation. Because I agree that the terms of the regulation do not apply to My Choice, I am granting My Choice's motion for partial dismissal.

---

[1] My Choice also moved for dismissal of plaintiffs' first cause of action on the ground that My Choice did not employ Care Managers until September 1, 2016 and thus could not have violated the FLSA before that time. In response to the motion, plaintiff amended her complaint and no longer alleges that My Choice violated the FLSA before September 1, 2016. *See* dkt. 23-1. Accordingly, this portion of defendant's motion is moot.

UNDISPUTED FACTS

Defendant My Choice is a private "managed care organization" that provides various healthcare and related services to adults and seniors with disabilities. Am. Compl., dkt. 23-1, ¶ 12. My Choice provides this care through its Care Managers, such as plaintiff, who provide ongoing, day-to-day case management services for its members. *Id*. at ¶ 17. Since its inception in 2016, My Choice has been approved by the IRS as a 501(c)(3) nonprofit organization.

OPINION

**I. Legal Standard**

Defendant contends that as a nonprofit, it is not covered by Wisconsin's overtime regulation, Wis. Admin. Code § DWD 274.03, and therefore plaintiff's state law claims must be dismissed. Defendant's motion, which appears to present a question of first impression in Wisconsin, requires this court to interpret provisions of Wisconsin's administrative code. In doing so, the court employs ordinary principles of statutory construction. *Orion Flight Servs., Inc. v. Basler Flight Serv.*, 2006 WI 51, ¶ 18, 290 Wis. 2d 421, 435, 714 N.W.2d 130, 137; *Basinas v. State*, 104 Wis.2d 539, 546, 312 N.W.2d 483 (1981). "Statutory interpretation begins with—and, absent ambiguity, is confined to—the language of the statute," and statutory words and phrases, unless technical in nature or carrying a peculiar legal meaning, are construed according to common and ordinary usage. *Fuchsgruber v. Custom Accessories, Inc.*, 2001 WI 81, ¶ 10, 244 Wis.2d 758, 628 N.W.2d 833; *Peterson v. Midwest Sec. Ins. Co.*, 2001 WI 131, ¶ 19, 248 Wis. 2d 567, 636 N.W. 2d 727; *see also* Wis. Stat. § 990.01(1). In determining a term's ordinary and common meaning, a court may consult a dictionary. *Rouse v. Theda Clark Med. Ctr., Inc.*, 2007 WI 87, ¶ 21, 302 Wis.2d 358, 735 N.W.2d 30. In addition, the court should

2

consider the statute's context and structure. *State ex rel. Kalal v. Circuit Court for Dane Cty.*, 2004 WI 58, ¶ 46, 271 Wis. 2d 633, 663, 681 N.W.2d 110, 124. "[S]tatutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id*.

If the rule's meaning is plain, then the court's inquiry ends. *State v. Reed*, 2005 WI 53, ¶ 13, 280 Wis.2d 68, 695 N.W.2d 315. If, on the other hand, an administrative regulation is ambiguous, then the court may resort to extrinsic aids to determine the agency's intent. *Williams v. Integrated Community Services, Inc.*, 2007 WI App 159, ¶ 13, 303 Wis. 2d 697, 736 N.W. 2d 226. A regulation is ambiguous if "it is capable of being understood by reasonably well-informed persons in either two or more senses." *Hacker v. State Dep't of Health & Soc. Servs.*, 197 Wis. 2d 441, 454, 541 N.W.2d 766, 770 (1995). In resolving the ambiguity, the court defers to the agency's interpretation and application of its own regulations unless the interpretation is inconsistent with the regulation or is clearly erroneous. *Williams*, 2007 WI App at ¶ 13. When interpreting a state regulation, this court's task is to predict how the Wisconsin Supreme Court would answer the question. *Liberty Mut. Fire Ins. Co. v. Statewide Ins. Co.*, 352 F.3d 1098, 1100 (7th Cir. 2003).

## II. The Rule at Issue

Wisconsin's Department of Workforce Development (DWD) is charged with promulgating "rules fixing a period of time, or hours of beginning and ending work during any day, night or week, which shall be necessary to protect the life, health, safety or welfare of any

3

person[.]" Wis. Stat. §§ 103.001, 103.02. *Weissman v. Tyson Prepared Foods, Inc.*, 2013 WI App 109, ¶ 6, 350 Wis. 2d 380, 384–85, 838 N.W.2d 502, 504. Pursuant to that authority, DWD enacted Wis. Admin. Code § DWD 274.03, which requires "each employer subject to this chapter" to pay its employees "time and one-half the regular rate of pay for all hours worked in excess of 40 hours per week." By its terms, Chapter 274 applies only to

> employees employed in manufactories, mechanical or mercantile establishments, beauty parlors, laundries, restaurants, confectionary stores, telegraph or telephone offices or exchanges or express or transportation establishments, hotels, and by the state, its political subdivisions and any office, department, independent agency, authority, institution, association, society or other body in state or local government created or authorized to be created by the constitution or any law, including the legislature and the courts . . .
>
> Wis. Admin. Code § DWD 274.015.

The parties agree that the only term in this regulation that might apply to My Choice is "mercantile establishment."[2] "Mercantile" happens to be one of only five defined terms in Chapter 274, but as discussed below, DWD's definition is so turbid that it defies unequivocal exegesis. According to DWD's rules, "mercantile" means

> "pertaining to merchants or trade," and is synonymous with the word commercial. Commercial is viewed with regard to profit or designed for profit; designed for mass appeal, emphasizing skill and subjects useful in business. "Trade" means the business or work in which one engages regularly, an occupation requiring manual or mechanical skill; the persons engaged in an occupation, business,

---

[2] Plaintiff has included a two-sentence fallback argument that defendant, as a care management organization certified by the Department of Health Services, is an independent agency, association, or society that was "created or authorized to be created" by Wisconsin law. This second argument merits little discussion. The last clause of DWD § 274.015 clearly applies to state political subdivisions . . . "*or other body in state or local government.*" Plaintiff does not allege that My Choice is a state or local government institution, agency or body. The mere fact that it is certified by a state agency is not enough to bring it within the scope of the regulation.

4

> or industry, dealings between persons or groups; the business of buying and selling or bartering commodities or services: to do business with, to have dealings, to give one thing in exchange for another.

Wis. Admin. Code § DWD 274.01.

This regulation appears to have been last amended in 1981.

III. **The Regulation's Definition of "Commercial" is Ambiguous**

Defendant argues that the first two sentences of this definition defeat plaintiff's claim that My Choice is a mercantile establishment covered by Chapter 274. As defendant reads the definition, the term "synonymous" in the first sentence means "equal to" or "the same as." Thus, defendant argues, mercantile establishments are only those establishments that are "commercial." And *those* establishments, says defendant, are only those that are "viewed with regard to" or "designed for profit," as specified in the second sentence. Because My Choice is a nonprofit organization, argues defendant, it is not a mercantile establishment and is not covered by the overtime law. At first blush, both logic and common sense would seem to support this position.

Not so fast, responds plaintiff: if DWD had wanted to exclude all nonprofits from coverage, then it would have said so, or it would have created an exemption to that effect. Instead, argues plaintiff, by defining the term "mercantile" broadly, DWD plainly meant to cover at least *some* nonprofit organizations. More specifically, plaintiff argues that the word "synonymous" as used in the definition is broader than defendant suggests: plaintiff points out that the word "synonym" has been defined as "a word having the same *or nearly the same meaning* as another in the same language." Br. in Opp., dkt. 24, at 9 (citing Webster's New World

5

Dictionary and Thesaurus (2nd ed. 2012)) (emphasis added). Finding a toehold in this definition's "nearly the same" language, plaintiff argues that by using the term "synonymous," DWD intended the regulation to cover "both commercial organizations . . . and those organizations that are *similar to, but not* commercial organizations . . . ." *Id.* (emphasis added).

This argument, while semantically clever, is unpersuasive. First, it is hard to reconcile plaintiff's interpretation with the next sentence of DWD's definition, as defendant points out. But let's dot the "i"s and cross the "t"s: Plaintiff has supported her argument with a definition of the word "synonym." The word actually used in the definition is "synonymous," which is defined as:

> 1. having the character of a synonym ; alike or nearly alike in meaning : capable of being substituted for another word or expression in a statement *without essentially changing the statement's meaning*; 2. *having the same connotations, implications, or reference* : suggesting the same thing
>
> Webster's Third New Int'l Dictionary (unabridged, 1972) at 2321, emphasis added.

Returning to the dictionary, "nonprofit" is defined as "not conducted or maintained for the purpose of making a profit," *see* Webster's, *supra*, at 1538, while "commercial" means: "1: of, in or relating to commerce; . . . 2 a: from the point of view of profit : having profit as the primary aim." *Id.* at 456. So, contrary to plaintiff's position, a neutral exegete more likely would characterize "commercial" and "nonprofit" as antonyms, not synonyms.

Giving the word "synonymous" its plain and ordinary meaning– "alike or nearly alike in meaning"–it is clear that the regulation uses the terms "mercantile" and "commercial" interchangeably. "Mercantile" is defined as "2 : of, relating to, or having the characteristics of mercantilism," which is defined as "the spirit, theory, or practice of mercantile pursuits :

6

devotion to commercial enterprise : COMMERCIALISM." Webster's, *supra*, at 1412. Thus, by explaining in the first sentence of the rule that "mercantile" is "synonymous with the word commercial," DWD seems to be making a clumsy pronouncement that "mercantile" as used in Chapter 274 has its usual and ordinary meaning.

DWD's definition gets clumsier as it progresses, which provides plaintiff with another opportunity to argue that My Choice is a "commercial" establishment. Plaintiff points out that DWD defines "commercial" as follows:

> Commercial is viewed with regard to profit or designed for profit; designed for mass appeal, emphasizing skill and subjects useful in business.

Focusing on the semicolon, plaintiff notes that "[a] semicolon is most commonly used to link (in a single sentence) two independent clauses that are closely related in thought." Br. in Opp., dkt. 24 at 10 (citing *Using Semicolons*, The Writing Center, University of Wisconsin-Madison (https://writing.wisc.edu/Handbook/Semicolons.html.) From this, plaintiff argues that by using a semicolon in this sentence, DWD meant to designate two alternate scenarios in which an establishment will be deemed "commercial":

(1) when it is "viewed with regard to profit or designed for profit"; or

(2) when it is "designed for mass appeal, emphasizing skill and subjects useful in business."[3]

Further, plaintiff argues, if the second clause is *not* given independent meaning, then it is mere surplusage.

---

[3] Plaintiff implies that her state law claim cannot survive dismissal unless this court adopts her proposed construction of the word "synonymous." Her second argument, however, stands on its own.

Plaintiff's argument has some traction. Notably, by contrast, DWD defines "trade" with a series of phrases separated by semicolons; there, it is plain that the semicolons function as disjunctive "ors," with each phrase setting out alternative meanings of the word "trade," as one would find in a dictionary. No reasonable argument can be made that in the sentence defining "trade" the semicolons function as "ands." If they did, then the sentence would make no sense. Next, it would be illogical to contend that DWD used semicolons as "ands" when defining "commercial," but then switched them to "ors" when it defined trade. Thus, I agree with plaintiff that by using a semicolon before the phrase "designed for mass appeal, emphasizing skill and subjects useful in business," the agency intended to describe a separate meaning of the word "commercial."

Even so, it is not at all clear that My Choice meets this portion of the definition; it is not even clear what this portion of the definition *means*. Plaintiff points solely to the fact that My Choice "had revenue from providing services exceeding $104 million" as evidence that My Choice is "designed for mass appeal." Br. in Opp., dkt. 24, at 11. This verges on being a non sequitur. While there might be some overlap between "high gross revenue" and "mass appeal" in a Venn diagram, the terms capture different notions. Regardless whether the term "for profit" is omitted from the definition, when one uses the word "commercial" to mean something "designed for mass appeal," one typically thinks of a product aimed for a large market, ordinarily with the goal of making a profit. *See, e.g.,* Webster's, *supra*, at 456 "commercial: . . . 1(d): suitable to or adequate for commerce <found oil in *commercial* quantities. . . . 2(b): sacrificing artistic principles for qualities that bring financial success <*commercial* drama><*commercial* music>." Implicit in both meanings is the buying and selling of a product in a large consumer market. A nonprofit, managed care organization doesn't even come to mind.

8

Adding to the confusion about the meaning of "designed for mass appeal" is the phrase "emphasizing skill and subjects useful in business." Is this phrase part and parcel of the "designed for mass appeal" definition, or is it a separate definition that should have been set out by a semicolon instead of a comma? We don't know. If the court assumes the former, *arguendo*, then must a product or business that is "designed for mass appeal" emphasize skill *and* subjects useful in business before it will be found commercial? What does it mean to "emphasize" a business skill or subject? What *is* a business skill or subject? Without answers to these questions–which neither party has offered–it is impossible to determine definitively from the rule's language whether it applies to My Choice. My inclination is to say that the rule, as written, does not appear to apply to My Choice, but at the dismissal stage, plaintiff is entitled to the most charitable characterization of DWD's definition of "commercial": it is ambiguous.

IV. **The DWD's Conclusion that Nonprofits are not "Mercantile Establishments" is Consistent with the Regulatory Language**

When an administrative regulation is ambiguous, the court may look to the agency's interpretation of the regulation to resolve the ambiguity. *Williams*, 2007 WI App 159, ¶ 13. Although the Wisconsin Supreme Court recently declared that it would no longer give "great weight" deference to agency interpretations of statutes, *Tetra Tech EC, Inc. v. Wis. Dep't of Revenue*, 2018 WI 75, ¶ 74, 382 Wis. 2d 496, 914 N.W. 2d 21, the court still gives "due weight" to "the experience, technical competence, and specialized knowledge of the agency involved, as well as discretionary authority conferred upon it." *Id*. at ¶¶ 77-78 (quoting Wis. Stat. § 227.57(10)). Here, the Wisconsin Legislature has expressly delegated to DWD the authority to promulgate rules regulating overtime wages. Wis. Stat. § 103.02. Accordingly, the agency's interpretation of its own rules is entitled to considerable weight, provided the interpretation is

consistent with the language of the regulation and is not clearly erroneous. *Williams*, 2007 WI App 159, ¶ 14. *Accord Schilling v. PGA Inc.*, No. 16-CV-202-WMC, 2018 WL 5266592, at *5 (W.D. Wis. Oct. 23, 2018) (reviewing DWD online resource to interpret overtime regulation).

The only interpretive guidance that either party or this court has been able to locate consists of a "Q & A" on DWD's website. Perhaps not surprisingly, it is not as clear as a reader would hope. It states:

> Q: Do non-profit organizations have to pay overtime?
>
> A. Generally, no. The overtime law does not apply to most non-profit organizations. The overtime law does apply, however, to those employees who work in certain establishments, such as restaurants or hotels, even if employed by non-profit organizations.
>
> https://dwd.wisconsin.gov/er/labor_standards/hours_of_work_and_overtime.htm.

Plaintiff argues that this interpretation supports her position, insofar as DWD expressly acknowledges that *some* nonprofit organizations have to pay overtime. Defendant, on the other hand, argues that DWD's interpretive guidance provides the one limited circumstance in which a nonprofit *would* have to pay overtime, namely, when one of its employees worked in an establishment such as a restaurant or hotel.

Defendant's view is more consistent with the wording and structure of the DWD's answer. Giving the paragraph an ordinary reading, it is plain that the third sentence closes the gap left open by the words "generally" and "most" in the first two sentences by explaining just when the overtime law *does* apply to nonprofits. It applies to employees who, although employed by a nonprofit organization, work in "certain establishments, such as restaurants or hotels." This explanation covers the situation where an individual is employed "by" a nonprofit organization but works "in" a restaurant or hotel. (A vocational agency or other job service agency that

10

provides job coaching comes to mind.) It does not support the broad interpretation that plaintiff advances here, namely, that a nonprofit that is "similar to" a commercial organization in that it has significant revenue or is "designed for mass appeal" is covered by the overtime law.

DWD's interpretation of its own regulation as not applying to nonprofits except in certain circumstances is consistent with the regulatory language and the ordinary understanding of the term "commercial." Given that DWD was granted wide-ranging authority to develop Wisconsin's overtime law, and that it drafted the regulation at issue pursuant to that authority, it is appropriate to defer to that interpretation. Accordingly, I conclude that My Choice, as a nonprofit managed care organization, is not subject to Wisconsin's overtime law.

ORDER

IT IS ORDERED that defendant My Choice's motion for dismissal of plaintiff's state law claim, dkt. 12, is GRANTED. Plaintiff has 30 days from the date of this order in which to file an amended complaint.

Entered this 24th day of April, 2019.

BY THE COURT:

/s/
_____
STEPHEN L. CROCKER
Magistrate Judge